247 So.2d 815 (1971)
SHELL OIL COMPANY, a Delaware Corporation
v.
Oree AINSWORTH et ux.
No. 46119.
Supreme Court of Mississippi.
May 10, 1971.
Gibbes & Graves, Laurel, Marvin Oates, Bay Springs, for appellant.
J.E. Ulmer, Jr., Bay Springs, for appellees.
INZER, Justice:
Appellees, Oree Ainsworth and his wife, Elline Ainsworth, brought suit in the Circuit Court of the Second Judicial District of Jasper County against appellant, Shell Oil Company, seeking to recover damages for the killing of the fish and damage to a pond on their premises. The declaration alleged that the appellees were the owners of the northeast quarter of the northwest quarter of Section 34, Township 2 North, Range 10 East in Jasper County, and that located upon this land was a two and a half acre pond stocked with fish; that the defendant Shell Oil Company was the operator of Jenkins No. 1 oil well located on adjoining land about 150 yards west of their property. It was charged that a few days prior to January 18, 1969, Shell Oil Company reworked the oil well, and in doing so let oil, salt, chemicals and other matters spill out onto the ground and into a pit in which the dam was broken and that heavy rains washed said matters into their pond killing 5,000 catfish, 100 bass and destroying the usefulness of the pond. They alleged that as a result of this trespass, they were entitled to recover actual and punitive damages in the amount of $9,775.
Shell Oil Company in its answer denied that it was guilty of any negligence or trespass causing the damage, if any, complained of by the plaintiffs. By the way of a plea in bar, the defendants pled a release executed by Ainsworth wherein for a consideration of $1,200 he released Shell Oil Company of any and all claims for damages heretofore asserted by him or any future claims to the personal property or the land described in the release. This release was executed on February 11, 1966, and it stipulated that Ainsworth was to retire the mud pit at the Jenkins No. 1 well and level the pit to his satisfaction, and he assumed all responsibility of the mud pit and its contents. He agreed to hold Shell harmless for any loss of livestock and any and all *816 stream pollution caused by leaks or breaks in the pit.
Plaintiffs' answer denied that Ainsworth had breached his contract and alleged the damage suffered by them had no connection with the mud pit.
After trial, the jury returned a verdict in favor of the plaintiffs for $4,700, and the judgment was entered accordingly. A motion for a new trial was sustained by the trial court for the reason that in its opinion the verdict of the jury was excessive to the extent of $700. Plaintiffs were allowed ten days to enter a remittitur of $700 and the remittitur was entered reducing the judgment to $4,000. From this judgment, Shell Oil Company appeals.
The evidence on behalf of appellees, when considered in the light most favorable to them, established that on January 18, 1969, Mr. Ainsworth was notified by D.C. Breland that the fish in his pond were dying. Ainsworth and his two daughters went to the pond and noticed that some fish were dead and others were dying. He noticed a foreign substance on the water which he "gathered to be oil." There was a ditch which led from his pond, and he followed it up to the Jenkins No. 1 well site noticing along the way spots of oil. All the drainage from the well site flowed either into the fresh water pit or directly into the ditch and none flowed into the mud pit. The dam on the mud pit was not broken and there were no signs that the pit had overflowed or that water was seeping from the mud pit. A few days prior to this day, a rig was seen at the oil well site, and it was thought that the well was being reworked. Heavy rains had fallen the preceding three days, and it was drizzling rain at the time Mr. Ainsworth and his daughters went to the pond.
On the following day, Mr. Ainsworth filled three jugs with water from the pond, two of the jugs were turned over to the county agent, who sent them to the Mississippi State University where the water was tested by Dr. James P. Minyard, state chemist, who found the water to be very alkaline, the pH factor being in excess of the value of 9. The normal pH value is 7, and in the Bay Springs area, waters generally have a tendency to have pH values of about 6 1/2 which is on the acidity side of the alkalinity-acidity values. It was his opinion that the increase in this alkalinity from normal pH value to over 9 would cause fish to die. It was also his opinion that it would require a foreign substance to increase the pH value to the extent it was found in this water. Apparently, he made no analysis of the water to determine what chemicals were in the water to cause the pH factor to be so high. Neither did he test the specific gravity of the water to determine the concentration of the dissolved substance in the water. He said the salt content of the water did not exceed 1250 parts permitted. He found a small amount of petroleum floating on the water, but he did not analyze this substance to determine whether it was crude oil or refined oil. He did not think the amount of oil was enough to cause any problem.
Dr. W.J. Lorio, a fishing and wildlife biologist, testified that the high alkaline pH content of the water tested would kill fish and that before the pond could be used to raise fish, it would have to be drained and at least two inches of the bottom removed. He did not think that the petroleum content was high enough to cause any damage to the fish.
The foremost and principal question to be decided is whether the evidence on behalf of the appellees is sufficient to establish any causal connection between the death of the fish and the activities of the appellant on their property. A case such as this may be established by circumstantial evidence but the circumstances must be such as to take the case out of the realm of conjecture and place it within the field of legitimate inference. Considering the evidence in the light most favorable to appellees, we are of the opinion that the circumstantial evidence is not sufficient to take this case out of the realm of conjecture, *817 and that the trial court was in error in refusing to direct the jury to find for the appellant.
There is ample evidence to establish that the appellees' fish died as a result of some foreign substance being in the water in the pond. However, appellees failed to identify this substance and also failed to show that appellant was responsible for it being in the pond. Appellees rely upon Magnolia Petroleum Co. v. Stinson, 230 Miss. 533, 93 So.2d 815 (1957). There Stinson's sheep died as a result of drinking water from a stream which ran through appellant's pasture. An analysis was made of the water, and it was found to contain a high concentration of sodium dihydrogen phosphate, which, in the opinion of the veterinarian, was sufficient to cause the death of the sheep. Stinson and two other persons, upon learning that the sheep were sick and dying, observed a muddy formation in the stream and traced this formation up the stream to the oil well site. There they found that the mud pit was overflowing, and Stinson testified he saw all sorts of drilling chemicals at the well. Some of the bags had been opened, used and stacked but about one-half of a truck load had not been used. Some of these were soft from the rain, and had burst open and scattered all over the ground. The well site had not been cleaned up since the well was drilled. Magnolia contended that it was entitled to a directed verdict because Stinson failed to show that the chemical substance found in the stream came from the well or pit or that the substance found at the well site contained any substance that would cause damage to the sheep. We pointed out that Stinson met the requirement in Masonite Corp. v. Hill, 170 Miss. 158, 154 So. 295 (1934), by having analysis made and the offending chemical identified. We stated in Magnolia, supra:
The appellant knew, or it should have known, that if it permitted harmful substances to overflow from its well site into the nearby gully, such substances, in turn, would flow into the stream, which ran through the pastures, and would thereby become a source of danger to the plaintiff's live stock. The result was foreseeable and should have been provided against. Consequently the Court was warranted in finding that a failure to do this was negligence. (230 Miss. at 545, 93 So.2d at 820).
Appellees in the present case failed to identify the chemical which caused the high pH factor in the water and failed to show that appellant used any chemical at the well site when its crew was working on the well a few days before the death of the fish. The evidence on behalf of appellees, at the most, only established that appellant did some work at the well site, the nature and extent of which was not shown. Even if we were to hold that this was sufficient for the jury to draw an inference that some chemicals were used in this work, the inference was completely overcome by appellant's uncontradicted proof that no chemicals were used when the well work was done at the well site. Mr. Rials, production superintendent for appellant, testified that he was present when the work was done at the Jenkins No. 1 well some six or eight days prior to the date the fish died, and that the only work done was to pull the pump and repair it. The only foreign substance used in this operation was to pump sixty barrels of salt water into the well. Rials testified that this was done in such a manner that none was spilled on the ground, and that no oil was spilled during this operation. The well had been a pumper for two years and was what he termed "a dead well." There was no evidence that any one saw any residue of chemicals of any sort at the well site.
We are of the opinion that the trial court was in error in refusing to grant appellant's request for a directed verdict at the conclusion of all the evidence in this case. For the reasons stated, this case is reversed and judgment will be entered here for the appellant.
Reversed and rendered.
All Justices concur.